1

2

3

4

5

6

7

8              IN THE UNITED STATES DISTRICT COURT

9            FOR THE EASTERN DISTRICT OF CALIFORNIA

10   CORNELIUS MOORE,

11            Petitioner,              No. 2:98-cv-1625 WBS JFM P

12      vs.

13   GEORGE GALAZA, et al.,

14            Respondents.             FINDINGS & RECOMMENDATIONS

15   _____/

16            Petitioner is a state prisoner proceeding through counsel with an application for a

17   writ of habeas corpus pursuant to 28 U.S.C. § 2254.  In 1995 petitioner pleaded guilty to burglary

18   of an inhabited dwelling, second degree robbery, assault with intent to commit the felony of oral

19   copulation, and taking a vehicle without the owner's consent.  Petitioner also admitted two prior

20   serious or violent felonies.  He was sentenced to twenty-five years to life in prison.  This action is

21   proceeding on five claims raised in petitioner's second amended petition, filed August 14, 2001,

22   challenging his 1995 conviction and sentence.  Petitioner claims that his guilty plea was not

23   knowing and voluntary and that he received ineffective assistance of counsel with respect to

24   possible defenses, the three strikes sentence imposed, and his appellate rights.  He also claims

25   that his right to due process was violated when the state courts did not grant him permission to

26   pursue a direct appeal after good cause was shown for his late notice of appeal.

FACTUAL AND PROCEDURAL BACKGROUND

The criminal charges against petitioner arose out of events in the early morning hours of February 12, 1995, at the victim's residence in Stockton, California shortly after she and a friend returned from a trip to Sacramento.  Ex. 8 to Second Amended Petition, Stockton Police Department Police Report No. 95-8258, Sgt. Mazzuloa, at 3.  After the victim's friend left, the victim heard a knock on her front door.  Id.at 4.  As she walked toward the door, a voice said "Stockton Police Department, open the door."  Id.  She became "extremely concerned and suspicious because the voice sounded very similar to the voice" of a man who had approached her when she arrived home.  Id.  She walked to the telephone in the kitchen.  Id.  As she picked up the phone and started to call 9-1-1, she heard a "loud crash" and a man kicked in the front door and entered the residence.  Id.  He ran toward her, grabbed her around her upper body from behind and pulled the receiver out of the telephone.  Id. at 5.  As a consequence, she was unable to complete the 9-1-1 call.  Id.  The man told her not to look at him, that he had a gun and if she looked at him he would kill her.  Id.

The man forced the victim toward the master bedroom.  Id.  He told to "give him head."  Id.  She refused and told him she had money she would give him if he would just leave her alone.  Id.  The man told her to give him the money.  Id.  She lifted up the mattress and removed $400.00, which she handed to the man.  Id. at 5-6.  She also handed him "the keys to her car and told him to just take the car and leave."  Id. at 6.  The man paused.  Id.  The victim told him "that her friend and her friend's boyfriend were coming right back and that he had better leave."  Id.  He then "ordered her to get into bed and cover herself up."  Id.  She refused.  Id.  He again demanded she "sit on the bed and not make a sound or come out, or he would kill her."  Id.

The victim sat on the bed and the man walked out of the bedroom for a few seconds, then came right back in.  Id.  He told her to stay there and not move and "he would drop her car off close by the residence and would leave it on the street."  Id.  He then left the room.  Id.  She heard him go outside and start the car.  She ran out the back door to another residence, from

1   which she called police.  Id.  The man had taken her phone when he left the residence.  Id. at 7.

2   Three days later, she spotted the man and called the police.  Id. at 3, 7.  She subsequently

3   identified petitioner as the man who had kicked in her front door.  Ex. 9 to Second Amended

4   Petition, Stockton Police Report No. 95-8258, Det. Catherwood, at 3.

5        Petitioner was arrested on February 15, 1995.  Id. at 4.  In an interview with a

6   detective the next day, petitioner repeatedly stated that he didn't remember anything and that he

7   had been at his mother's house.  Id.  Later that day, the detective spoke with petitioner's mother,

8   who told him that petitioner "just got out of prison.  He ain't right.  He's got something wrong

9   with his head.  He was supposed to get help."  Id.

10        Shortly thereafter,

11      [c]riminal proceedings were suspended and petitioner was
12      interviewed by three mental health care professionals between
   March 8 and April 7, 1995, two of whom found him incompetent
13      to stand trial.  On April 26, 1995, a jury found that petition [sic]
   was not competent to stand trial.  He was admitted to Atascadero
14      State Hospital on June 7, 1995, and transferred to Patton State
   Hospital on July 6, 1995.  On August 1, 1995 Patton recommended
15      that petitioner be returned to court based on the conclusion that he
   had an understanding of the court process and the ability to
16      cooperate with his attorney.  The report from Patton noted that,
   although petitioner does have some sort of mental illness, his
17      exaggeration of his symptoms to feign incompetence made it
   impossible to determine the nature of his illness.  Id.; also
18      appended to Resp'ts' February 6, 2003 Response [docket no. 75].

19      Criminal proceedings were reinstated, and a preliminary hearing
   was held October 6, 1995.  The Deputy Public Defender
20      representing petitioner made a note in his file about a possible
   defense of not guilty by reason of insanity.  The file notes also
21      indicate petitioner said he now remembered the incident and
   generally agreed with the allegations, but denied demanding sex.

22      An information was filed October 19, 1995.  At the pretrial
   conference held November 28, 1995, petitioner, represented [by]
23      Deputy Public Defender Judy Hansen, entered a guilty plea to all
   four charges, admitting . . . May 9, 1989 and April 12, 1993 priors.

24

25   Ex. M to Motion to Dismiss, filed Mar. 18, 2003, In re Cornelius Gerome Moore, Case No.

26   59381, Order filed May 2001, slip op. at 2.

1    Petitioner was convicted on November 28, 1995 pursuant to his negotiated plea of

2    guilty.  On February 1, 1996, petitioner signed and dated a notice of appeal, which was received

3    in the San Joaquin County Superior Court on February 6, 1996.  Ex. A to Motion to Dismiss.  On

4    February 13, 1996, a notice was issued by the Clerk of that court, informing petitioner that his

5    notice of appeal was untimely, had therefore been "received but not filed," and that petitioner

6    could contact the Central California Appellate Program to seek relief from the default.  Ex. B to

7    Motion to Dismiss.

8    On April 8, 1996, petitioner filed a petition for writ of habeas corpus in the San

9    Joaquin County Superior Court.  Ex. C to Motion to Dismiss.  That petition was denied by order

10   signed May 3, 1996.  Ex. D to Motion to Dismiss.  On June 24, 1996, petitioner filed a petition

11   for writ of habeas corpus in the California Court of Appeal for the Third Appellate District.  It

12   was denied by order filed June 27, 1996.  Ex. E to Motion to Dismiss.

13   On July 7, 1997, petitioner filed a petition for writ of habeas corpus and

14   application for relief from the defaulted notice of appeal in the state court of appeal.  Ex. G to

15   Motion to Dismiss.  That was denied by order filed July 10, 1997.  Ex. H to Motion to Dismiss.

16   On July 30, 1997, petitioner filed a second petition for writ of habeas corpus in the Superior

17   Court for San Joaquin County seeking relief from the defaulted notice of appeal.  That petition

18   was denied on September 12, 1997.  Ex. I to Motion to Dismiss.

19   On October 17, 1997, petitioner filed a petition for writ of habeas corpus in the

20   California Supreme Court.  Ex. J to Motion to Dismiss.  That petition was denied on April 29,

21   1998.  Ex. K to Motion to Dismiss.  The instant action was filed on July 16, 1998.[1]

22   On July 23, 1999, respondents filed a motion to dismiss the instant action as

23   barred by the statute of limitations.  On February 9, 2000, the district court denied the motion to

24   dismiss.

25

26   [1] The petition was originally filed in the Fresno Division of this Court and transferred to the Sacramento Division by order filed August 21, 1998.

On June 1, 2000, petitioner filed an amended petition.  On June 15, 2000, this action was stayed pursuant to the stipulation of the parties pending exhaustion of state court remedies as to additional claims.  On August 14, 2001, petitioner filed a motion for leave to amend together with the second amended petition on which this action is proceeding. Petitioner's motion was granted on November 15, 2001, and respondents filed their answer on May 10, 2002.[2]  In early 2005, this action was stayed pending completion of proceedings in the San Joaquin County Superior Court on a petition for writ of habeas corpus filed by petitioner in that court.  The state superior court held evidentiary hearings over several days, and denied the petition by order filed July 13, 2006.  The stay in this court  was lifted on September 19, 2006 and the matter was submitted thereafter following filing of supplemental briefing by both parties.

ANALYSIS

I.  Standards for a Writ of Habeas Corpus

Federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Under section 2254(d)(1), a state court decision is "contrary to" clearly established United States Supreme Court precedents if it applies a rule that contradicts the

---

[2]  On March 18, 2003, respondents again moved to dismiss the action as barred by the statute of limitations.  By order filed May 9, 2003, respondents motion was denied "without prejudice to the court reaching the limitations defense upon consideration of the merits of the case."  Order filed May 9, 2003 at 2. In that order, the court also found that respondents' motion failed to meet the requirements for reconsideration of the district court's February 9, 2000 order denying their first motion to dismiss the action as time-barred.  In view of that finding, the subsequent proceedings in this action, and the disposition on the merits recommended herein, this court will make no further findings concerning the statute of limitations defense.

1  governing law set forth in Supreme Court cases, or if it confronts a set of facts that are materially

2  indistinguishable from a decision of the Supreme Court and nevertheless arrives at different

3  result.  Early v. Packer, 537 U.S. 3, 7 (2002) (citing Williams v. Taylor, 529 U.S. 362, 405-406

4  (2000)).

5          Under the "unreasonable application" clause of section 2254(d)(1), a federal

6  habeas court may grant the writ if the state court identifies the correct governing legal principle

7  from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the

8  prisoner's case.  Williams, 529 U.S. at 413.  A federal habeas court "may not issue the writ

9  simply because that court concludes in its independent judgment that the relevant state-court

10  decision applied clearly established federal law erroneously or incorrectly.  Rather, that

11  application must also be unreasonable."  Id. at 412; see also Lockyer v. Andrade, 538 U.S. 63,

12  123 S.Ct. 1166, 1175 (2003) (it is "not enough that a federal habeas court, in its independent

13  review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'")

14          The court looks to the last reasoned state court decision as the basis for the state

15  court judgment.  Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002).

16  II.  Petitioner's Claims

17          A.  Validity of Guilty Plea/Ineffective Assistance of Counsel

18          Petitioner's first claim is that his guilty plea was not knowing and voluntary, in

19  violation of the Due Process Clause of the Fifth and Fourteenth Amendments to the United States

20  Constitution.  His second claim is that he did received ineffective assistance of counsel in

21  connection with entry of that plea.  Specifically, petitioner claims that despite his long history of

22  mental illness, including a finding by a jury at the start of the instant criminal proceedings that

23  petitioner was incompetent to stand trial, his attorney did not adequately investigate or advise

24  petitioner about possible viable defenses, including an insanity or a diminished capacity defense.

25  The last reasoned state court rejection of these claims is the 2006 decision of the San Joaquin

26  County Superior Court, which rejected the claims as follows:

6

"A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction ... has two components.  First, the defendant must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment.  Second, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.  Unless a defendant makes both showings, it cannot be said that the conviction ... resulted from a breakdown in the adversary process that renders the result unreliable." [*Strickland v. Washington* (1984) 466 U.S. 668, 687; 104 S.Ct. 2052; 80 L.Ed.2d 674.]

Petitioner contends that his counsel was ineffective in that she failed to investigate the possibility of a plea of not guilty by reason of insanity or, in the alternative, to investigate whether his alleged mental difficulties prohibited him from forming the specific mental states involved in the crimes for which he has been convicted....

**A.  Insanity Defense.**  "[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies."  [Strickland, supra., at p. 697.]  In this case, petitioner has failed to demonstrate that he was prejudiced by his counsel's alleged failure to investigate the possibility of an insanity plea.

Had petitioner entered a plea of not guilty by reason of insanity, he would have had "the true burden of proving insanity by a preponderance of the evidence."  [1 Witkin, Cal. Crim. Law 3d (2000) Defenses, § 15, p. 347.]  The evidence presented to the court during this proceeding fails to meet that burden.  During his testimony, Dr. Jackman on several occasions stated that petitioner *could* have been legally insane at the time he committed the crimes to which he pled.  He *never*, however, stated that, in his opinion, petitioner *was* legally insane.  In fact, Dr. Jackman expressly stated that he was *unable* to render an opinion regarding petitioner's sanity.  [See, e.g., November 17, 2005 R.T., 28:18-20; 29:1-7.][3]  This testimony would have been insufficient to meet petitioner's burden of proof during a sanity hearing.  He has therefore failed to demonstrate that he suffered any prejudice as a result of counsel's alleged error.

/////

_____

[3]Subsequent to the evidentiary hearings, Dr. Jackman submitted a declaration which is *directly contradictory* to his testimony at the hearing.  The court finds that the declaration therefore lacks any credibility.

7

**B. Intent.**  Petitioner's trial counsel testified twice in evidentiary hearings on this matter.  Her testimony revealed that she considered petitioner's medical condition and the possibility that it could have affected his ability to form the requisite intent for the crimes as well as the possibility of an insanity defense. However, she determined that it would not be in petitioner's best interest to raise these issues.  She also noted that petitioner told her he did not want to go trial, and counsel agreed that it was best to plead the case out, "Because the offenses charged were fairly horrendous.  I thought that Mr. Moore had a history that would be coming out to a jury.  Because of the nature of the victim would be a sympathetic, likable, gentle person.  That a jury would react to the victim in a way that would be very prejudicial to Mr. Moore." [December 15, 2005 R.T., 11:23-28.]

Counsel also believed that neither an insanity defense or a lack of intent argument would have been meritorious "because his memory was fairly good about the night of the incident, the particulars and the motivation and the sequencing of what happened... ."  [*Id*., at 13:7-9.]  Counsel also was concerned in that one of the psychiatrists who had examined petitioner was of the opinion that he was malingering.  "That his illness was not nearly as severe as the portrayal.  That his symptoms seemed to respond to his will rather than the medications.  That his memory lapses were convenient.  I was very concerned that his disability may not be as severe as it was portrayed." [*Id*., at 29:23-28.]  In addition, employees at both Atascadero and Patton State Hospital had also indicated a belief that petitioner was malingering, and "psych techs" at the County Jail had given counsel this same opinion. [See, *id*., at 31:9-11.]

Given the foregoing, it appears that counsel's decision not to raise either an insanity defense or argue that petitioner lacked the requisite intent was a knowledgeable tactical decision.  This court cannot say, as a matter of law, that counsel's decision was unreasonable.  [See *People v. Jackson* (1980) 28 Cal.3d 264, 289-290; 168 Cal.Rptr. 603; 618 P.2d 149 (disapproved on other grounds in *People v. Cromer* (2001) 24 Cal.4th 889, 901, 103 Cal.Rptr.2d 23, 15 P.3d 243).]

**C. Voluntariness of Plea.**  This matter was charged as a third strike case.  Had petitioner been convicted on the charges set forth in the information, he was facing a *minimum* of 51 years to life, and possibly 111 years to life.  Petitioner was nearly 31 years old at the time of the crimes herein, so even the minimum sentence may have been, in reality, a sentence of life without parole.  Counsel instead negotiated a sentence of 25 years to life, giving petitioner at least some chance at parole.

A review of the plea transcript reveals that the court carefully inquired into petitioner's state of mind in entering the plea.

8

> Petitioner now states only that, had he known that he had a possible insanity defense, he "would not have signed the plea agreement or pleaded guilty...." [Petitioner's declaration, 1:28.] Given the evidence presented at the hearings, and that set forth in the plea agreement, this statement is insufficient to demonstrate that the plea was either involuntary or the product of ineffective assistance of counsel. [_In re Alvernaz_ (1992) 2 Cal.4th 924, 830 P.2d 797, 8 Cal.Rptr.2d 713; _Hill v. Lockhart_ (1985) 474 U.S. 52, 106 S.Ct. 366, 88 L.Ed.2d 203.]

Ex. 15, In the Matter of the Petition of Cornelius Moore For Writ of Habeas Corpus, Case No. SC059381, Order filed July 13, 2006, at 1-3.

"A guilty plea operates as a waiver of important rights, and is valid only if done voluntarily, knowingly, and intelligently, with sufficient awareness of the relevant circumstances and likely consequences." Bradshaw v. Stumpf, 545 U.S. 175, 183, 125 S.Ct. 2398 (2005) (citation and internal quotations omitted). Where a defendant enters a plea of guilty upon the advice of counsel, the voluntariness of the plea depends on whether the defendant received the effective assistance of counsel. Hill v. Lockhart, 474 U.S. 52, 56-57 (1985).

The two-part test of Strickland v. Washington, 466 U.S. 668 (1984) applies to challenges to guilty pleas based on ineffective assistance of counsel. Hill, 474 U.S. at 57. First, the defendant must show that counsel's representation fell below an objective standard of reasonableness. Id.(citing Strickland, 466 U.S. at 687-88). There is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. Strickland, 466 U.S. at 689.

Second, the defendant must show that counsel's deficient performance prejudiced the defendant. Id. at 694. "[T]he defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." Hill, 474 U.S. at 59. "[W]here the alleged error of counsel is a failure to advise the defendant of a potential affirmative defense to the crime charged, the resolution of the prejudice inquiry will depend largely on whether the affirmative defense likely would have succeeded at trial." Id. The focus of the prejudice analysis is on whether the result of the proceeding was

1    fundamentally unfair or unreliable.  Lockhart v. Fretwell, 113 S.Ct. 838, 844 (1993).

2    "Unreliability or unfairness does not result if the ineffectiveness of counsel does not deprive the

3    defendant of any substantive or procedural right to which the law entitles him."  Id.  Finally, "a

4    court need not determine whether counsel's performance was deficient before examining the

5    prejudice suffered by the defendant as a result of the alleged deficiencies.  The object of an

6    ineffectiveness claim is not to grade counsel's performance.  If it is easier to dispose of an

7    ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be

8    followed."  Strickland, at 697.

9            California no longer recognizes a diminished capacity defense.  See People v.

10   Anderson, 28 Cal.4th 767, 782 (2002).  However, "[u]nder California law, a criminal defendant

11   is allowed to introduce evidence of the existence of a mental disease, defect, or disorder as a way

12   of showing that he did not have the specific intent for the crime."  Patterson v. Gomez, 223 F.3d

13   959, 965 (9th Cir. 2000) (quoting Cal. Penal Code § 28(a)).[4]  All of the crimes to which

14   petitioner pleaded guilty are specific intent crimes under California law.  See Answer to Petition

15   for Writ of Habeas Corpus, filed May 10, 2002, at 23-24.  California also recognizes a defense of

16   insanity in criminal proceedings.  See, e.g., Cal. Penal Code § 25.  California Penal Code § 25

17   provides in relevant part:  "In any criminal proceeding . . . in which a plea of not guilty by reason

18   of insanity is entered, this defense shall be found by the trier of fact only when the accused

19   person proves by a preponderance of the evidence that he or she was incapable of knowing or

20   understanding the nature and quality of his or her act and of distinguishing right from wrong at

21   the time of the commission of the offense."

22

23          [4] California Penal Code § 28(a) provides:  "Evidence of a mental disease, mental defect,
     or mental disorder shall not be admitted to show or negate the capacity to form any mental state,
24   including but not limited to, purpose, intent, knowledge, premeditation, deliberation, or malice
     aforethought, with which the accused committed the act.  Evidence of mental disease, mental
25   defect, or mental disorder is admissible solely on the issue of whether or not the accused actually
     formed a required specific intent, premeditated, deliberated, or harbored malice aforethought,
26   when a specific intent crime is charged."

1    There is substantial evidence in the record of petitioner's history of major mental

2    illness.  As petitioner's expert, Dr. Jackman, noted in his December 10, 2002 report:

3         Since 1992 Mr. Moore has been seen as seriously
         psychiatrically disturbed and has been treated with a variety of
4         powerful antipsychotic medications during this period.  Over the
         past three years Mr. Moore has been given a variety of diagnoses,
5         all of which involved psychosis and are serious mental illnesses
         requiring continuous potent medication for treatment.  These
6         diagnoses include:

7         1)  Cocaine Induced Persisting Psychotic Disorder; Cocaine
         Dependence, and Borderline Intellectual Functioning;
8
         2)  Schizophrenia, Paranoid Type, Cocaine Dependence and
9         Borderline Intellectual Functioning;

10        3)  Psychotic Disorder NOS;

11        4)  Schizophrenia, Paranoid Type, Continuous;

12        5)  Schizoaffective Disorder, Depressed; Mental Retardation;

13        Even when an assessment of Malingering was made back in
         1995 Mr. Moore was still felt to be suffering from some mental
14        illness but it was not possible to make a diagnosis since it was not
         clear which were real and which were malingered symptoms.
15
         I do not believe that a definite diagnosis can be made at this
16        time because the role of cocaine in inducing his psychosis is
         unclear.  I do believe that Mr. Moore continues to suffer from a
17        severe and disabling psychotic disorder, incompletely treated, that
         has had a profound negative effect on his life and functioning and
18        has contributed in a major way to his legal difficulties.

19   Ex. 19 to Petitioner's San Joaquin County Superior Court State Habeas Corpus petition, lodged

20   September 28, 2006 (hereafter 2006 State Habeas Petition), at 13-14.

21        Petitioner's commitment offense was committed five days after he paroled from

22   state prison.  In late 1994, while in prison, petitioner was treated with Sinequan and Thorazine

23   for a diagnosis of organic affect disorder with psychotic symptoms.  Ex. 6 to 2006 State Habeas

24   Petition.  Petitioner discontinued his medication in late December 1994, against medical advice,

25   and was described as "asymptomatic" three to four days after discontinuing the medication.  Ex.

26   7 to 2006 State Habeas Petition.  According to petitioner, he paroled from state prison on

February 7, 1995.  In his December 10, 2002 report, Dr. Jackman reported that petitioner had

described the commitment offense to him as follows:

> [Petitioner] stated that he had been out of prison for a week and that he had decided not to take the medications that were prescribed for him, Thorazine and Sinequan.  He said that he made that decision because he had stopped hearing the voices.  He said, "I stopped because I didn't think I needed them any more."  He said that he started back hearing the voices within a few days of stopping the medications.  He said that he did not have any medication and that he had an appointment with the clinic to start to get his medications again.  He said that he had been to the clinic to set up an appointment to see the doctor as soon as the voices began and his mother told him to go down there.  He said that he did not get the chance to make it back because he was arrested.  He claimed that he told the clinic that it was urgent but was told he had to come back and see the doctor.
>
> He said that for the current offense, "The voices told me to go into the house and see what you can get out of the house."  He denied wanting to have sex with the victim.  He said that he remembered that she told him to take the money and the car and to leave.  He remembered that he got in by kicking the door.  He claimed that he did not remember these events while he was at Atascadero State Hospital or at Patton State Hospital and that those memories only came back later.  He insisted that these were his memories and not what he had been told.
>
> He said that he did what the voices said that night because he was "hearing voices real bad".  He claimed that this was the only time that he did what the voices told him to do and that was the only time the voices told him to do anything.  When prompted he did recall that the voices had told him to go to the store and buy clothes for the kids, but he did not have any kids.
>
> He said that on the night of the offense he had used a fifth of vodka and also a twenty-dollar rock of cocaine.  He did not remember the lapse of time between the drug use and the offense.  At another point during the interview he said that when he was arrested he remembered most of what happened; kicking the door, getting her money and her car keys.  He said that when he was arrested he remember most of what happened; kicking in the door, getting her money and her car keys.  He said that over time his memories of the events remained constant.

Id. at 6-7.

On February 16, 1995, four days after the commitment offense, petitioner's

mother told a detective investigating the crime that petitioner had "'just got out of prison.  He

1  ain't right.  He's got something wrong with his head.  He was supposed to get help.'"  Ex. 9 to

2  2006 State Habeas Petition.  The police report of an interview with petitioner, conducted on

3  February 16, 1995, four days after the commitment offense showed that petitioner stated to the

4  investigating officer that he didn't know why he was in jail and didn't remember anything.  Id.

5         Petitioner made similar statements to a psychologist and a psychiatrist who

6  evaluated him in March 1995 for competency proceedings.  Exs. 12 and 13 to 2006 State Habeas

7  Petition.  Those proceedings ended in a jury determination that petitioner was not competent to

8  stand trial, and on June 7, 1995, petitioner was admitted to Atascadero State Hospital.  Ex. 14 to

9  2006 State Habeas Petition.  On July 6, 1995, petitioner was transferred to Patton State Hospital

10  (Patton).  Id.  On August 1, 1995, the medical director at Patton certified that petitioner was

11  mentally competent.  Id.  He was discharged with diagnoses of malingering; psychotic disorder,

12  NOS; polysubstance abuse; and antisocial personality disorder.  Id.  The clinical notes that

13  accompanied the report stated that a physician had found that petitioner "seemed to have

14  selective memory dysfunction" but that "[h]is selective memory loss and inconsistent display of

15  symptoms cause staff to question his validity."  Id.  In addition, the report stated that

16         [t]he treatment team believes he does have some sort of mental
       illness, but it is impossible to determine what it is due to his lack of
17         honesty about his true symptoms.  Results from psychological
       testing validate the teams's impression that Mr. Moore is
18         exaggerating his symptoms to appear incompetent.  It is the
       opinion of the treatment team that Mr. Moore does have an
19         understanding of the courtroom personnel and procedures.  It is
       also believed that he does have an ability to cooperate with his
20         attorney, although he does not choose to do so.

21  Id.

22         On September 18, 1995, a public defender met with petitioner at the jail.  Notes

23  that she made to the file were that petitioner was "very pleasant and seemed oriented," that "he

24  agreed that he was competent" and that "he thought he would like to make a deal and that he did

25  not want to take it to trial because then he would get the 25-life."  Ex. 15 to 2006 State Habeas

26  Petition.  Notes made by petitioner's public defender after his October 1995 preliminary hearing,

which followed certification that he was competent to stand trial, are consistent with what petitioner reported to Dr. Jackman in 2002:  petitioner reported that he "now remembers the incident, generally agrees w/ the allegation but denies demanding sex."  Ex. 16 to 2006 State Habeas Petition.

Petitioner's trial counsel testified in December 2005 at the state court evidentiary hearing that she did not "recall" talking to petitioner about possible defenses.  Reporter's Transcript (RT), December 15, 2005, at 11:3-17.  Instead, the discussions focused on "how we could resolve the case without him having to go to trial."  Id. at 11:15-17. She further testified that she "had thought of" a plea of not guilty by reason of insanity and didn't "know why we did not go with that as – as an option."  Id. at 12:25-28.  She further testified, however, that she "had concerns that because his memory was fairly good about the night of the incident, the particulars and the motivation and the sequencing of what happened" that she did not feel that a plea of not guilty by reason of insanity "was viable."  Id. at 13:11.

In his 2002 report, Dr. Jackman offered an opinion concerning whether petitioner was legally insane at the time of the offenses, as follows:

> While I did not examine him specifically to determine his sanity at the time of the offense we do know that he stopped all of his medications before he was paroled from Folsom, that he was asymptomatic at the time of his parole, and that according to his psychiatrist he had no insight whatsoever into his mental illness. We also know that soon after parole he began to be symptomatic and that he went to the mental health clinic to be able to get renewals of his medications but that was delayed until a clinic psychiatrist could see him.  His mother said, "Cornelius just got out of prison.  He ain't right.  He's got something wrong in his head.  He was supposed to get help."
>
> All of this history suggests that Mr. Moore was reexperiencing the same psychotic symptoms that he had been treated for in prison.  These psychotic symptoms and the behavior that they could have led to could have rendered Mr. Moore legally insane at the time of the offenses.

Ex. 19 to 2006 State Habeas Petition, at 14-15.  At the 2005 evidentiary hearing Dr. Jackman testified that he was "very reluctant" to make a psychiatric diagnosis of petitioner, because

certain necessary assessments had not been done.  RT, November 17, 2005, at 26:14-24.  He

further testified that there was "ample evidence" that petitioner "could have been legally insane"

but that he was not affirmatively saying that petitioner was in fact legally insane.  Id. at 28:18-

28.[5]

In his 2002 report, Dr. Jackman also offered his opinion about whether

petitioner's mental illness might  have affected his ability to form the specific intent required for

the commitment offenses:

> [i]t is my opinion to a reasonable degree of medical certainty that
> Mr. Moore was suffering from a severe form of a psychotic illness
> involving both mood and thought disorder at the time of the
> offenses and that that illness may have affected his ability to form
> the requisite specific intent to commit the alleged crimes.  This
> opinion is based on both his self-report as well as the reports of his
> public defender and evaluating psychologist following his arrest on
> February 15, 1995.  He manifested the same symptoms after his
> arrest as he had manifested in prison when he was either not
> medicated or incompletely medicated.
>
> As his psychotic mental illness seriously interfered with his
> thought process it may well have interfered with his ability to form
> the requisite specific intent to commit the alleged crimes.  It is
> likely that Mr. Moore's judgment was seriously impaired because
> of his psychotic illness and that his offense behavior could be the
> result of irrational impulse rather than of any considered plan.

Ex. 19 to 2006 State Habeas Petition, at 15.

In order for petitioner to prevail on his first two claims, he must show, inter alia,

that he was prejudiced by any unreasonable error by his trial attorney.  With respect to the failure

to investigate and advise petitioner about possible defenses, one element necessary to establish

prejudice is a showing that the defenses "likely would have succeeded at trial."  Hill, supra, at 59.

After review of the record, this court is unable to find that either a defense of not guilty by reason

---

[5]  Dr. Jackman later submitted a declaration in which he stated that he did not feel
additional testing was required in order to offer an opinion concerning petitioner's legal sanity at
the time he committed his offense, and that such testing was "independent of the issue of legal
insanity at the time of the offense."  Ex. 2 to 2006 State Habeas Petition.  He further opined that
petitioner was legally insane at the time of the offense.  Id.  The state court found that this
declaration was "directly contradictory" to Dr. Jackman's testimony.  Ex. 15 at 2 n.1.

1    of insanity, or a defense that petitioner's mental illness prevented him from actually forming the

2    specific intent for any of the charged crimes, likely would have succeeded at trial.  While the

3    record contains substantial evidence of petitioner's history of mental illness, it is equivocal about

4    the role that illness played in petitioner's intent the night of the crimes, or his capacity to know

5    and understand what he was doing that night, or his ability to distinguish right from wrong when

6    he broke into the victim's house and committed the crimes to which he pleaded guilty.  For that

7    reason, petitioner cannot show that he was prejudiced by counsel's failure to advise him

8    concerning possible defenses related to his mental illness, nor can he show that his guilty plea

9    was an involuntary product of ineffective assistance of counsel.[6]  The state court's rejection of

10   these two claims was not contrary to controlling principles of United States Supreme Court

11   precedent.  Accordingly, both claims should be denied.

12          B.  Other Claims of Ineffective Assistance of Counsel

13          Petitioner raises two other claims of ineffective assistance of counsel.  In his third

14   claim for relief, he contends that he received ineffective assistance of counsel in connection with

15   the sentence he received under California's Three Strikes law.  Petitioner's fourth claim is that

16   his counsel was ineffective in failing to consult with petitioner about his appellate rights and in

17   failing to file a notice of appeal.

18          1.  Three Strikes Sentence

19          Petitioner's third claim is that his counsel was ineffective in failing to investigate

20   the circumstances of petitioner's prior convictions and to request that the trial court exercise its

21   discretion to strike one or more of those prior convictions.  Specifically, petitioner contends that

22   his trial counsel was ineffective in failing to file a state habeas corpus petition seeking relief

23   under People v. Romero, 13 Cal.4th 497 (1996), a case decided after petitioner's pleaded guilty

24   but expressly made "fully retroactive."  Romero, at 530 n.13.  The last reasoned state court

25   
26          [6]  The record does not support petitioner's contention that he was prejudice by counsel's
     failure to do more investigation than she did with respect to possible mental health defenses.

16

rejection of this claim is the 2006 decision of the San Joaquin County Superior Court, which

rejected the claim as follows:

> **D.  Romero Motion.**  Petitioner's own evidence, in addition to the
> testimony of Mr. Broderick, reveals that subsequent counsel
> determined that such a motion would have been meritless.  [See
> February 28, 2006 R.T., 19:7-10; Petitioner's Exhibits 8 and 11.]
> He has therefore failed to demonstrate either that the failure to
> make a motion was error or that he suffered any prejudice.

Ex. 15, In the Matter of the Petition of Cornelius Moore For Writ of Habeas Corpus, Case No.

SC059381, Order filed July 13, 2006, at 3.

This claim is not cognizable in this federal habeas corpus action.  Petitioner has

no constitutional right to counsel in collateral proceedings, see Pennsylvania v. Finley, 481 U.S.

551, 555 (1987), and a claim of ineffective assistance of counsel on state collateral post-

conviction proceedings is not a ground for federal habeas corpus relief.  See 28 U.S.C. §

2254(i).[7]  For that reason, this claim must be denied.

2.  Failure to Appeal

Petitioner's fourth claim is that counsel was ineffective because she failed to

consult with petitioner concerning his appellate rights and by failing to file a notice of appeal, in

violation of the Sixth and Fourteenth Amendments to the United States Constitution.

The last reasoned state court rejection of this claim is the May 7, 2001 decision of

the San Joaquin County Superior Court, which rejected the claim as follows:

> Petitioner next contends he received ineffective assistance of
> counsel due to his trial attorney's failure to consult with him
> regarding his right to appeal and failure to file a notice of appeal.

---

[7]  It does not appear that petitioner is arguing that his trial counsel should have anticipated
the decision in Romero and sought to have one or more of the prior convictions stricken at the
time of sentencing.  In any event, such a contention would be without merit.  See Lowry v.
Lewis, 21 F.3d 344, 346 (9th Cir. 1994) (counsel not ineffective for failing to anticipate decision
in a later case).

The evidence does not support petitioner's contention.  The plea transcript reflects that petitioner was advised by the court that his plea bargain included a waiver of his right to appeal "any issues in the case."  Petitioner clearly indicated he understood that.  [Plea transcript, p.4, lines 7-10.]  Further, before entering his plea, petitioner signed a written waiver of rights which included the paragraph "As long as the sentencing judge sentences me according to the terms of this plea I will not be able to appeal this conviction or the sentence that I receive."  Petitioner initialed the paragraph to indicate he had read it.  The court asked petitioner if he had gone over the waiver form, and read and initialed those portions that applied to him.  Petitioner indicated he had.  The court inquired if he had any questions about the document or any questions about anything he had read and initialed.  Petitioner replied "no."  The court asked if petitioner had any questions about anything the court had spoken to him about that morning.  Petitioner again replied "no."  [Plea transcript p. 6, lines 7-20.]  The court then asked petitioner's attorney if she had the opportunity to go over the plea form with petitioner and whether he understood the rights he was giving up.  The attorney indicated she believed petitioner understood to the best of his ability.  The court again questioned petitioner if he had any concerns about understanding everything being discussed.  Petitioner assured the court he understood everything and had no questions.  [Plea transcript p. 6, line 21 to p.7, line 18.]

Petitioner had clearly consulted with his attorney regarding his right, and the waiver of his right, to appeal.  The right to appeal having been waived, petitioner's trial attorney had no duty to file a notice of appeal on petitioner's behalf.

Ex. M to Respondent's Motion to Dismiss, In the Matter of the Petition of Cornelius Gerome Moore, Case No. 59381, slip op. at 6-7.

The United States Supreme Court has "laid out the 'proper framework for evaluating an ineffective assistance of counsel claim based on counsel's failure to file a notice of appeal without [petitioner]'s consent.'"  U.S. v. Sandoval-Lopez, 409 F.3d 1193, 1195 (9th Cir. 2005) (quoting Roe v. Flores-Ortega, 528 U.S. 470, 473 (2000)).  "The framework imposed by the Court for determining whether there was ineffective assistance of counsel was (1) ask whether counsel consulted with the defendant about an appeal; (2) if not, was failure to consult deficient performance."  Sandoval-Lopez, at 1195-96 (citing Flores-Ortega at 478).  Deficient performance is shown

18

in failure to consult cases where "there is reason to think either (1) that a rational defendant would want to appeal (for example, because there are nonfrivolous grounds for appeal), or (2) that this particular defendant reasonably demonstrated to counsel that he was interested in appealing."  For the "would want to appeal" branch, a "highly relevant factor" in determining whether a rational defendant would want to appeal is whether the plea was entered pursuant to a plea agreement, whether the defendant had been sentence in accord with his agreement, and whether the plea agreement waived or reserved the right to appeal.

Sandoval-Lopez, at 1196 (quoting Flores-Ortega at 480).

[T]o show prejudice, the defendant "must demonstrate that there is a reasonable probability that, but for counsel's deficient failure to consult with him about an appeal, he would have timely appealed." Prejudice does not require that the defendant show that he had meritorious grounds for appeal, but "evidence that there were nonfrivolous grounds for appeal or that the defendant in question promptly expressed a desire to appeal will often be highly relevant in making" the determination whether there is a reasonable probability that the defendant would have appealed. Thus, the defendant does not have to show that he might have prevailed on appeal to show prejudice, just that he probably would have appealed had his lawyer asked.

Sandoval-Lopez, at 1196 (quoting Flores-Ortega at 480, 484, 485).

During the entry of petitioner's guilty plea, the following colloquy took place between the court, petitioner, and petitioner's attorney:

THE COURT:  All right.

In addition to that, you are going to be waiving any appellate rights to any issues in this case.

Do you understand that?

THE DEFENDANT:  Yeah.

. . . .

THE COURT:  Ms. Hansen, you have had the opportunity to go over the plea form.

Do you feel your client understands the consequences of his plea and the rights he is giving up?

MS. HANSEN:  I believe he understands to the best of his ability, Your Honor.

THE COURT:  Mr. Moore, it has been brought to the court's attention you are on medication, Thorazine, is that correct?

THE DEFENDANT:  Yeah.

THE COURT:  It's also the Court's understanding that the effect that has on you is it causes you to be more calm.  It hasn't affected your ability to think through what is going on.  It hasn't affected your ability to understand the proceedings; is that correct?

THE DEFENDANT:  Yeah.

THE COURT:  Do you have any concerns about the fact you are on that medication that we should put this off to a time you are not on the medication?

THE DEFENDANT:  No.

THE COURT:  You understood everything we have talked about?

THE DEFENDANT:  Yes.

THE COURT:  Any questions you have at all of this Court?

THE DEFENDANT:  No.

THE COURT:  It is clear to the Court and the Court has through the dialogue we have had, attempted to make the determination about whether there is any impairment as to Mr. Moore's ability as to what he is doing and the consequences of his plea.

It's clear to this Court that is not the case.

Ms. Hansen, I assume that is likewise your position?

MS. HANSEN:  Since he has gotten back from Atascadero he has been fairly well maintained.  He has been moved from the medical and sheltered unit to general population.  I understand he is doing well in general population.

THE COURT:  Your contacts with him when he has been on the Thorazine, he appeared to understand you and to be able to relate back and forth with you as it relates to the circumstances of the case and the negotiations of the plea?

MS.HANSEN:  As far as the negotiations of the plea, I feel he understands.

1    He has problems as many of us do with understanding the three
     strike law, and the seriousness of it.
2
     THE COURT:  Other than the feelings about the desirability of
3    being subject to the three strikes law, has he indicated to you any
     other problems or any other concerns you have as it relates to his
4    ability to understand the proceedings we are going through?

5    MS. HANSEN:  No.

6    Ex. D to Ex. A to Respondent's Motion to Dismiss filed July 23, 1999, Reporter's Transcript of

7    Change of Plea, November 28, 1995 (Transcript of Change of Plea), at 4:6-10, 6:21-8:17.

8    In the verification to his second amended petition, petitioner avers that he was not

9    aware of his appellate rights at the time he entered his guilty plea.  Verification and Declaration

10   of Cornelius Gerome Moore, signed July 3, 2000, appended to Memorandum of Points and

11   Authorities in Support of Second Amended Petition filed August 14, 2001.  However, at the time

12   he entered his plea he admitted in open court that he understood he was waiving "any appellate

13   rights to any issues" in his case.  Transcript of Change of Plea, at 4:6-10.  "Solemn declarations

14   in open court carry a strong presumption of verity."  Blackledge v. Allison, 431 U.S. 63, 74

15   (1977).  Thus, assuming arguendo that his attorney failed to consult with him about filing a

16   notice of appeal, that failure did not fall outside the bounds of reasonably competent professional

17   assistance because petitioner had waived his right to appeal.  See Sandoval-Lopez at 1196.[8]

18   For these reasons, the state court's rejection of petitioner's fourth claim for relief

19   was not contrary to controlling principles of United States Supreme Court precedent.  Petitioner's

20   fourth claim for relief should be denied.

21   /////

22   /////

23   _____

24   [8] The record also supports a finding that petitioner would have pursued an appeal if his
     attorney had asked, because petitioner in fact made several attempts to pursue a direct appeal.
25   But this evidence would only support an ineffective assistance of counsel claim if counsel's
     failure to consult with petitioner about whether to file a notice of appeal constituted deficient
26   performance.  For the reasons set forth in these findings and recommendations, this court finds
     that the failure to consult with petitioner was not deficient performance.

1       C. <u>Failure to Allow Petitioner to Proceed on a Late Notice of Appeal</u>

2       Petitioner's fifth claim is that petitioner was denied his right to due process under

3 the Fifth and Fourteenth Amendments to the United States Constitution when the California

4 Court of Appeal and the California Superior Court erred by not permitting petitioner to pursue

5 his direct appeal after good cause was shown for his late filing.

6       This claim was presented to the California Supreme Court in a petition for writ of

7 habeas corpus which was denied without comment on May 23, 2001.  There is no reasoned state

8 court opinion addressing this claim.

9       This claim raises essentially a state law question:  whether under California law

10 the California Court of Appeal and the California Superior Court should have allowed petitioner

11 to file a late appeal.  A claim based purely on a question of state law is not cognizable in a federal

12 habeas petition.  <u>Estelle v. McGuire</u>, 502 U.S. 62, 67-68 (1991).  Accordingly, petitioner's fifth

13 claim should be denied.

14       For all of the foregoing reasons, petitioner's application for a writ of habeas

15 corpus should be denied.  Pursuant to Rule 11 of the Rules Governing Section 2254 Cases in the

16 United States District Courts, "[t]he district court must issue or a deny a certificate of

17 appealability when it enters a final order adverse to the applicant."  Rule 11, 28 U.S.C. foll. §

18 2254.  A certificate of appealability may issue under 28 U.S.C. § 2253 "only if the applicant has

19 made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  The

20 court must either issue a certificate of appealability indicating which issues satisfy the required

21 showing or must state the reasons why such a certificate should not issue.  Fed. R. App. P. 22(b).

22 For the reasons set forth in these findings and recommendations, petitioner has made a

23 substantial showing of the denial of a constitutional right with respect to his first two claims for

24 relief:  whether his guilty plea was involuntary and whether his trial counsel provided ineffective

25 assistance in failing to advise him concerning possible mental health defenses.  Accordingly, a

26 certificate of appealability should issue as to those two claims.

1    For the foregoing reason, IT IS HEREBY RECOMMENDED that:

2    1.  Petitioner's application for a writ of habeas corpus be denied;

3    2.  The district court issue a certificate of appealability for petitioner's first two

4  claims for relief:  whether his guilty plea was involuntary and whether his trial counsel provided

5  ineffective assistance in failing to advise him concerning possible mental health defenses.

6    These findings and recommendations are submitted to the United States District

7  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen

8  days after being served with these findings and recommendations, any party may file written

9  objections with the court and serve a copy on all parties.  Such a document should be captioned

10  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

11  shall be served and filed within fourteen days after service of the objections.  The parties are

12  advised that failure to file objections within the specified time may waive the right to appeal the

13  District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

14  DATED: September 3, 2010.

15

16                                   _____
                                     UNITED STATES MAGISTRATE JUDGE
17

18  12
    moor1625.hc
19

20

21

22

23

24

25

26